**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| JAMAEL BRAZZIEL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CASE NO. 09 C 3757 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| RICK HARRINGTON, Warden, | ) | |
| Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Jamael Brazziel is currently incarcerated at Menard Correctional Center in Menard, Illinois. Rick Harrington,[1] the warden of the facility, has custody of Petitioner. Brazziel has filed a *pro se* writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Court denies Brazziel's petition for a writ of habeas corpus [7 and 9].

**I.   Background**

   **A.   Factual Background**

District court review of a habeas petition presumes all factual findings of the state court to be correct, absent clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). Therefore, the Court adopts the following accounts from the Illinois Appellate Court's Order in *People of the State of Illinois v. Brazziel*, 939 N.E.2d 989 (Ill. App. 1st Dist. 2010).

On April 26, 2006, Petitioner shot Larry Brown in the back of the head after learning that Brown had been involved in an altercation with his cousin. Police subsequently interviewed six

---

[1] The Court substitutes Rick Harrington, the current warden at Menard Correctional Center, for named Respondent Michael P. Atchison. See Fed. R. Civ. P. 25(d).

witnesses, including Petitioner's cousin, who had been present at the scene and identified Petitioner as the shooter. On April 9, 2008, a Cook County jury found Petitioner guilty of first degree murder, and the trial court sentenced Petitioner to a sixty-year prison term for that crime.

*1. Trial*

On direct appeal, the state appellate court summarized the evidence adduced at trial as follows:

> The trial evidence demonstrated that a crowd of teenagers was gathered on the street around 9 P.M. on April 26, 2006. The victim had been 'slap boxing' with a girl named Jean McDaniel. McDaniel alerted her cousin, Anthony 'Red' Raper. In response, Raper began searching for the victim. When McDaniel identified the victim, Raper approached him. Raper and the victim exchanged punches, none of which made contact. The victim then ran in the opposite direction and the crowd on the street, including Raper, chased after him. Raper's cousin, [Petitioner], was at the front of that crowd with Raper. [Petitioner] then drew a handgun and pointed it at the victim. He fired one fatal shot to the back of the victim's head. The victim immediately fell to the ground.
>
> The State called six witnesses, all of whom testified to being in or near the crowd when the shooting occurred. Yolanda Floyd, who lived on the street where the crowd was gathered, and Raper testified that they witnessed [Petitioner] shoot the victim as the victim ran away from the crowd.

The State's other four eyewitnesses claimed for the first time at trial that they had not seen (or could not remember having seen) the shooter. Those four witnesses were impeached with their earlier police and grand jury statements identifying Petitioner as the shooter. These statements were admitted as substantive evidence.

Petitioner called three witnesses in his defense: Samuel Harris, Curtis Palmer, and Eric Harris. All three testified that they were good friends of Petitioner's and were with him in the crowd at the time that Larry Brown was shot. They testified that Petitioner was within their sight at the time the shot was fired and that Petitioner did not have a handgun at that time. According to the three witnesses, after the shot was fired, the group, including Petitioner, ran away and

2

stayed together for approximately an hour. None of Petitioner's witnesses ever reported what they observed to the police.

Each of Petitioner's witnesses was cross-examined by the prosecution. During the cross-examination of Samuel Harris, the prosecutor questioned why, if Harris had observed the shooting, had he not informed the police:

> Q. So police cars in that neighborhood all the time?
> A. Yes.
> Q. So they're arriving?
> A. Yes.
> Q. And at that point, do you decide, well, I'm going to go up there and tell them what I saw?
> A. No.
> Q. You don't – did you care that anybody could have got shot over there?
> A. Yes, I did care, but . . .
> Q. You did care?
> A. Mm-hmm.
> Q. Because you're a caring person, right?
> A. Yes.
> Q. And you're such a caring person that if someone got shot, you would want to go tell the police what you saw, right?
> DEFENSE COUNSEL: Objection.
> THE COURT: Overruled.
> A. Yeah.
> Q. Okay. But you didn't?
> A. No, because I was young.
> Q. Even though there's police officers all over the place, right?
> A. No. I was young.
> Q. You were young?
> A. Mm-hmm.
> Q. So that stops you from talking to a police officer?
> A. What was I gonna tell?
> Q. So you didn't flag down any police cars, right?
> A. No, because I went home after that happened after we went to the block, I went home after that.

Later in its cross-examination of Samuel Harris, the prosecutor returned to this theme, asking why Harris had not sought to exonerate his friend earlier:

> Q. So a couple of weeks later, you found out that the [Petitioner] had been arrested for murder, correct?
> A. Yes.

3

> Q. For what had happened over on Cortland, right?
> A. Yes.
> Q. And you were out there at the time with [Petitioner], and he didn't shoot anybody according to you, right?
> A. Right.
> Q. That's important information, right?
> A. Yes.
> Q. That's real important information?
> A. Yes.
> Q. He's your good friend, right?
> A. Yes.
> Q. So when you found out that your good friend had been arrested for murder that you knew he wasn't involved in, you immediately – well, let me ask you. You would tell anybody that would listen that he wasn't involved, right?
> A. Yes.
> Q. So you immediately went three blocks to the north to the 25th District and told the police officer that [Petitioner] wasn't involved in that murder, you got the wrong guy?
> A. No.
> Q. You didn't do that?
> A. No.
> Q. And did you go to Area Five detective division which was on the second floor and demand to speak to a detective and say you got the wrong guy?
> A. No.
> Q. Well, at that point, did you – you eventually knew he had court dates, right?
> A. Yes.
> Q. Did you show up to the courthouse and demand to speak to an Assistant State's Attorney handling the case and say you got the wrong guy, you're prosecuting the wrong guy, did you say that?
> A. No.
> Q. Well, did you go to the newspapers?
> A. No.
> Q. The TV stations?
> A. No.
> Q. Tell them they got the wrong guy?
> A. No.
> Q. Basically this is the first time you're telling any judge or law enforcement officials about what you knew about the murder, correct, that [Petitioner] wasn't involved, correct, first time here today?
> A. Yes.

Similarly, the prosecutor cross-examined Eric Harris about his failure to contact the police about what he witnessed on the night of the shooting:

> Q. So you've got some idea that somebody got shot over there when you see all the police officers coming, right?

> A. Yes, sir.
> Q. And you kind of saw a good amount of what happened over there, right?
> A. Yes, sir.
> Q. So immediately you go up and talk to the police officers, right?
> A. No, I didn't go talk to the police officers.
> Q. It wasn't important to you?
> A. (No response.)
> Q. No?
> A. No.
> Q. You didn't really care about anybody who got shot out there, right?
> A. It wasn't none of my people.
> Q. None of your people, right, so you really don't care about them?
> A. I ain't saying I don't care about them. It wasn't none of my people.
> Q. Who's your people?
> DEFENSE COUNSEL: Objection.
> A. My friends.
> THE COURT: Overruled.
> Q. So if some random guy gets shot, because he's not one of your people, you really don't care about him, right?
> A. I didn't say I don't care.
> Q. Are you happy they got shot?
> A. No, I'm not.
> Q. Are you sad they got shot?
> A. No, I'm not.
> Q. You just have no feelings whatsoever about it?
> A. No, sir.
> Q. So the boy that got shot over there, you have no feelings for whatsoever?
> A. I never knew him.
> Q. So you never talked to any police officers, and then everybody goes on their way that night.

Finally, the prosecutor cross-examined Curtis Palmer about Petitioner's whereabouts at the time of the shooting:

> Q. Gunshots just gone off. You're not looking around for where your friends are, right?
> A. We gonna all meet up.
> Q. Okay. You just eventually hope that you all meet up?
> A. Hopefully.
> Q. That nobody got shot?
> A. I got to get out of danger myself.
> Q. You what?
> A. I got to get out of the way of danger myself.
> Q. Right, because you're really concerned ultimately about yourself, right?
> MR. BENDIG: Objection.
> THE WITNESS: Yes.

THE COURT: Overruled.
Q. So [Petitioner] is definitely with you, right?
A. Yes.

During the rebuttal closing argument, the prosecutor called into question the credibility of Petitioner's witnesses:

> Well, let's talk about the defense witnesses because it's interesting how the defense characterizes those witnesses. It's interesting because apparently they are like three little angels. Oh, they say they work. Oh, they got kids. They got jobs. What they don't have is credibility. And you know why? You heard them up there, three different stories. Three different stories.
>
> You know, it was Eric Harris that stated, and I think that basically sums up all three of those witnesses, he doesn't care about anybody but his friends. The boy that got shot, doesn't care. Didn't make him happy. Didn't make him sad. What a wonderful individual he is. What a great guy. What a great witness.
>
> And that is why he testified for the [Petitioner] because he didn't care about anybody but the [Petitioner]. That's why he got up there and did not tell you the truth, basically got up there and gave you a cockamamie story about how they're just like spectators at a football game, about a fight that they didn't know anything about.
>
> * * *
>
> Those witnesses were not credible whatsoever despite what counsel was saying about them.
>
> * * *
>
> Let's take them one by one. We have Samuel Harris . . . . So what is Samuel Harris watching? He's not watching anything.
>
> * * *
>
> That takes us to Curtis Palmer. This guy is useless. He didn't see anything. Apparently didn't see anything. He's standing there. He's with Eric, Samuel. Now that's exactly where they're at, but he says I can't see anything. It's a crowd. Well, if he's standing right with them, how come he didn't see the same thing? Because he's not telling you the truth.
>
> * * *
>
> That takes . . . us to Eric Harris. And once again, everything is summed up by this guy. Doesn't care about anybody but his people, his friends. Guy got shot. So what. Doesn't care. That's what he's about.
>
> * * *

> Credible, the three angels, jobs, kids. Yeah, they may have those. They don't have credibility, not in this courtroom.
>
> * * *
>
> Credible testimony of witnesses came from Anthony Raper, came from Yolanda Floyd and came from handwritten statements and Grand Jury testimony of Lakesha Gibbs, Shontrice Smith, De[S]ean Henry and Johnny Ceasar. That's where the credible testimony is, not with the defense witnesses who can't get their story straight, and basically can all be summed up by Eric Harris. 'I only care about my people.' That's one of his people, a guy who shoots down Larry Brown in the head over a squabble with a girl. That's the type of person he is.

During and after closing arguments, the trial court instructed the jury that closing arguments are not evidence and should be disregarded to the extent that they are not based on evidence.

On April 9, 2008, the jury found Petitioner guilty of first degree murder caused by his personal discharge of a firearm. On May 7, 2008, the trial court sentenced Petitioner to an aggregate of sixty years of imprisonment: thirty-five years imprisonment for first degree murder and a twenty-five-year consecutive enhancement for personally discharging a firearm.

    2.    *Direct appeal*

On direct appeal, Petitioner raised the following claims: (1) Petitioner was not proven guilty beyond a reasonable doubt of first degree murder; (2) the trial court failed to comply with the dictates of Illinois Supreme Court Rule 431(b) requiring jurors to be asked about their understanding of the burden of proof and the presumption of innocence; (3) the prosecutor improperly attacked the moral character of defense witnesses during cross examination and closing argument and trial counsel failed to object to a majority of these remarks; and (4) Petitioner's sentence was excessive.

The state appellate court affirmed the judgment of the trial court on November 22, 2010. See *People v. Brazziel*, 939 N.E.2d 989 (Ill. App. Ct. 1st Dist. 2010). The appellate court determined that Petitioner had forfeited the vast majority of his arguments with regard to the

prosecutor's treatment of his witnesses during cross-examination and closing argument by failing to lodge a contemporaneous objection to these alleged errors and include them in a post-trial motion. *Id.* at 1006-07. Regardless, the court concluded that none of the prosecutor's questions was erroneous, finding that "[t]he State was not attacking the defense witnesses' morality or lack thereof; rather, the State attempted to undermine the witnesses' credibility by attacking the fact that none of the witnesses reported what occurred on the night in question or attempted to provide information to the authorities to exonerate defendant." *Id.* at 1006. Further, the court reasoned that questions about the witnesses' concern for the welfare of their own friends (such as Petitioner) over that of strangers were relevant to demonstrate the witnesses' bias. *Id.* As to the closing argument, the court found that it was similarly, and properly, directed at the witnesses' credibility and biases as opposed to their general moral character. *Id.* at 1007. Although the prosecutor's facetious comments that one of the Petitioner's witnesses was a "wonderful individual" and a "great guy" may have "crossed the line of propriety . . . any error was cured when the jury was instructed at the end of trial that closing arguments were not evidence." *Id.*

Petitioner's ensuing petition for leave to appeal (PLA) in the Illinois Supreme Court repeated his arguments with regard to his sentence and the prosecutor's handling of his witnesses during cross-examination and closing argument. The Illinois State Supreme Court denied the PLA on March 30, 2011. Petitioner did not seek postconviction relief in Illinois state court.

### B. Procedural Background of Federal Habeas Petition

Petitioner filed his *pro se* petition for writ of habeas corpus on June 28, 2012. Construing his *pro se* allegations liberally (see *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013), Brazziel's petition raises two claims: (1) that the prosecutor improperly raised the issue of the defense witnesses' moral character during cross-examination and closing argument, and (2) that trial counsel was ineffective for failing to object to many of the allegedly improper remarks.

8

Respondent filed his answer on September 7, 2012, and Petitioner's reply brief was originally due on November 9, 2012, giving him approximately two months to respond to Respondent's answer. At Petitioner's request, the Court granted Petitioner four extensions of time to file his reply brief, and gave Petitioner until May 24, 2013 to file a reply brief. Petitioner did not file a reply brief, and the Court denied Petitioner's untimely fifth request for an extension of time, having granted four lengthy extensions and warning Petitioner that his fourth extension would be his last absent extraordinary circumstances.

## II. Legal Standards

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted unless the state court's decision was contrary to or an unreasonable application of federal law clearly established by the Supreme Court. See *Williams v. Taylor,* 529 U.S. 362, 402–03 (2000); *Warren v. Baenen,* 712 F.3d 1090, 1096 (7th Cir. 2013). In *Williams,* the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." See *id.* at 405; see also *Kamlager v. Pollard,* 715 F.3d 1010, 1015 (7th Cir. 2013) ("A state court decision is 'contrary to' federal law if it applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts.").

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. See *Williams,* 529 U.S. at 407; see also *Taylor v. Grounds,* 721 F.3d 809, 817 (7th Cir. 2013). "The state court's application of federal

9

law must not only be incorrect, but 'objectively unreasonable.'" *Rann v. Atchison,* 689 F.3d 832, 835 (7th Cir. 2012); see also *Williams,* 529 U.S. at 410 ("*unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original). To be considered objectively unreasonable, a state court's decision must be "well outside the boundaries of permissible differences of opinion." *Kamlager,* 715 F.3d at 1016 (citation omitted).

"A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), 'thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz,* 571 F.3d 680, 685 (7th Cir. 2009) (citations omitted). In particular, a habeas petitioner must fully and fairly present his federal claims through one full round of state court review before he files his federal habeas petition. See *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Mulero v. Thompson,* 668 F.3d 529, 536 (7th Cir. 2012). To fairly present a claim in state court, the petitioner must include both the operative facts and the controlling legal principles on which the claim is based, and also must alert the state court that the claim raised is based on federal law. *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001); *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004). "[W]hen a petitioner has exhausted his state court remedies and failed to properly assert his federal claims at each level of review those claims are procedurally defaulted." *Woods v. Schwartz,* 589 F.3d 368, 373 (7th Cir. 2009). Procedural default precludes federal court review of a petitioner's habeas claims. See *Mulero*, 668 F.3d at 536.

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the Court's failure to consider the claim would result in a fundamental miscarriage of justice. See *House v. Bell,* 547 U.S. 518, 536

(2006); *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. See *Murray v. Carrier,* 477 U.S. 478, 492 (1986); *Weddington v. Zatecky,* 721 F.3d 456, 465 (7th Cir. 2013). Prejudice means actual prejudice infecting the "entire trial with error of constitutional dimensions." *Murray,* 477 U.S. at 494 (citation omitted). A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

## III. Analysis

### A. Petitioner's Ineffective Assistance Claim

Petitioner contends that trial counsel was ineffective for failing to object to many allegedly improper remarks made by the prosecutor during trial. To preserve a claim for federal habeas review, a petitioner must raise it "in one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "In Illinois, this means that a petitioner must have [ ] appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). Petitioner raised his current ineffective assistance argument in his direct appeal to the state appellate court, but he subsequently omitted it from his ensuing PLA in the Illinois Supreme Court. Because Petitioner did not raise his ineffective assistance allegation in one complete round of state court review, Petitioner has procedurally defaulted his ineffective assistance of counsel claim. *Boerckel*, 526 U.S. at 845; *White v. Godinez*, 192 F.3d 607, 608 (7th Cir. 1999) (failure to pursue claim on discretionary appeal to state high court on postconviction review constitutes procedural default).

Petitioner can excuse his default by showing that (1) there is cause and prejudice for the default; or (2) the absence of federal habeas review would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner asserts that failing to review his claim would result in a "fundamental miscarriage of justice." To avoid default under this theory, Petitioner must present to this Court "'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 321 (1995)). Petitioner then must establish that, in light of that evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House*, 547 U.S. at 536-37 (citing *Schlup*, 513 U.S. at 327). This standard requires a "stringent showing" and "permits review only in the extraordinary case." *House*, 547 U.S. at 522.

Petitioner has pointed to no "new reliable evidence" that would cast doubt on his guilt. And having failed to submit any "new, reliable evidence" in this regard, Petitioner is saddled with a record of six eyewitnesses identifying him as the shooter at some point prior to trial. This unrebutted evidence is sufficient to deny substantive review under the "fundamental miscarriage of justice" exception. See *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("it is black letter law that the testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar"); see also *United States ex rel. Priester v. Hardy*, 2012 WL 567629, at *3 (N.D. Ill. Feb. 21, 2012) (finding that defaulted claim was not open to review under "fundamental miscarriage of justice" exception where petitioner presented "no new evidence," but "merely recited events" of crime "from his own perspective" and generally attacked physical proof introduced at trial); *United States ex rel. Williams v. Hulick*, 2010 WL 1292450, at *7 (N.D. Ill. Mar. 25, 2010) (rejecting "fundamental miscarriage of justice"

argument where petitioner "introduce[d] no new evidence that the state courts have not already considered and rejected").

B.     **Petitioner's Prosecutorial Error Claim**

Petitioner also argues that the prosecutor improperly raised the issue of the defense witnesses' moral character during cross-examination and closing argument. Respondent contends that Petitioner partially defaulted on this claim because the state appellate court rejected the vast majority of his challenges to the prosecutor's cross-examination and closing argument on state procedural grounds. The independent and adequate state ground doctrine "bar[s] federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Franklin v. Gilmore*, 188 F.3d 877, 881 (7th Cir. 1999) (internal quotations omitted); see also *Coleman*, 501 U.S. at 729-30 ("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Lee v. Davis*, 328 F.3d 896, 899-900 (7th Cir. 2003) (same). The state appellate court held that Petitioner forfeited his challenge to all but two of the prosecutor's cross-examination questions by failing to make a contemporaneous objection and file a post-trial motion, as state law requires. Similarly, the appellate court held that Petitioner forfeited all challenges to the prosecutor's closing argument by failing to object.

The appellate court's denial of these portions of Petitioner's claim on the ground of forfeiture provides an adequate and independent state ground for denying relief. First, the state court's application of the rule was independent of the underlying question. That is, the appellate court did not intertwine the underlying issue concerning the prosecutor's cross-examination and closing argument with its enforcement of the well-settled Illinois rule requiring preservation of an error at trial by (1) lodging a contemporaneous objection to it; and (2) including it in a post-

13

trial motion. See *People v. Enoch*, 522 N.E.2d 1124, 1129 (1988). Instead, the state appellate court's procedural resolution of the bulk of Petitioner's claim rested independently on state law. See *Holmes v. Hardy*, 608 F.3d 963, 967 (7th Cir. 2010) (relevant question is whether "state court's decision rests on the substantive claims primarily, that is, whether there is no procedural ruling that is independent * * * [h]ere, the state court's procedural ruling was primary, and a fortiori, independent") (internal citations omitted and emphasis in original).

Second, the rule relied upon by the appellate court is firmly-established and regularly-followed in state practice. See *Franklin*, 188 F.3d at 882. Since at least 1988, state law has required that a criminal defendant preserve errors for appeal both by objecting to them at the time of their occurrence and including them in a written post-trial motion. *Enoch*, 522 N.E.2d at 1129-30; see also *People v. Kitch*, 942 N.E.2d 1235, 1240 (Ill. 2011) (reaffirming rule); 725 ILCS 5/116-1 (codifying post-trial motion requirement). Thus, the majority of Petitioner's prosecutorial-error claim is procedurally defaulted "on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730; see also *Gomez v. Jaimet*, 350 F.3d 673, 677-78 (7th Cir. 2003) (denying claim on "independent and adequate" state law ground where, under *Enoch* and applicable statutory provision, state court had found issue forfeited for failure to include in post-trial motion); *Whitehead v. Cowan*, 263 F.3d 708, 726-27 (7th Cir. 2001) (same). Even where, as here, the state court enforced the forfeiture and then reviewed the claim for plain error, the procedural bar still is sufficient to enforce the procedural default. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2003) ("it is settled (at least in this circuit) that a plain-error exception to a procedural rule does not compromise that rule's quality as an independent ground of decision").

Broadly construed, Petitioner's habeas petition appears to argue that the state-court forfeiture (and ensuing procedural default) of his prosecutorial error claim is attributable to his

14

trial counsel's failure to make appropriate objections at the right time. A petitioner may assert ineffective assistance of counsel as "cause" for a default, but only if the ineffective assistance argument is not, itself, defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000). Here, as previously set forth, Petitioner defaulted his ineffective assistance claim by failing to raise it in one complete round of state court review. Therefore, he may not assert that argument as cause to remedy the default of his prosecutorial error claim. Additionally, for the reasons stated previously with regard to Petitioner's ineffective-assistance claim, Petitioner has failed to demonstrate that the absence of federal habeas review would result in a "fundamental miscarriage of justice."

That leaves consideration of the rest of Petitioner's claim of prosecutorial error on the merits. The relevant state-court review of the prosecutor's cross-examination is in two parts: (1) substantive review of the two preserved objections concerning the cross-examination of Samuel Harris and Curtis Palmer; and (2) plain error review of the remainder of the complained-of cross-examination, which (as explained above) is defaulted. To determine if a prosecutor's cross-examination or closing argument violated due process, a court must first consider whether the challenged questions or comments were improper. See *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005). If so, the court must then determine whether the comments prejudiced the defendant. *Id.*

The state appellate court found that the prosecutor's cross-examination properly explored the witnesses' credibility and potential bias. The court concluded that the prosecutor's questions about whether the witnesses reported to police what they saw at the time of the shooting were proper because they reflected on their credibility. See *People of the State of Illinois v. Brazziel*, 939 N.E.2d 989, 1006 (Ill. App. 1st Dist. 2010) (noting that "the State attempted to undermine the witnesses' credibility by attacking the fact that none of the witnesses reported what occurred

on the night in question or attempted to provide information to the authorities to exonerate [petitioner]"); see also *United States v. Hollins*, 811 F.2d 384, 390 (7th Cir. 1987) (challenges to witnesses' credibility proper). The witness's failure to report their observations earlier could reasonably lead to the inference that their testimony about those observations—that petitioner was not the shooter—was fabricated at trial. See *Morales v. Johnson*, 659 F.3d 588, 600-01 (7th Cir. 2011) (identifying witnesses' "lack of initial cooperation with authorities" as a "factor weighing against their credibility). There are additional inferences that could be drawn from the failure to timely report observations, but this line of questioning factors into the witnesses' credibility.

Similarly, the prosecutor's questions about whether the witnesses cared more about themselves and their friends—including Petitioner—than about other people—such as the victim—reflected on the witnesses' bias. See *People of the State of Illinois v. Brazziel*, 939 N.E.2d at 1006 ("The State further demonstrated the defense witnesses' bias by establishing that Palmer was most concerned about his safety and that of his group and that Eric's allegiance was to his group of friends."); see also *United States v. Meyer*, 157 F.3d 1067, 1080 (7th Cir. 1998) (challenges to witnesses' bias proper). Additionally, the witnesses' close relationship to Petitioner supported the inference that they may have slanted or even manufactured their testimony in his favor. See *United States v. Ozuna*, 674 F.3d 677, 682 (7th Cir. 2012) (evidence of relationship between defendant and witness relevant to bias). The cross-examination at issue highlighted their motives to lie and their failure to report their observations to the police prior to trial. The state appellate court's conclusion that the prosecutor properly explored the witnesses' credibility and potential bias was neither factually nor legally unreasonable.

In its plain error review, the state appellate court determined that the prosecutor's closing argument focused on the witnesses' credibility rather than on their general moral character. See

*People of the State of Illinois v. Brazziel*, 939 N.E.2d at 1007. The prosecutor introduced his discussion of Petitioner's witnesses by stating "[w]hat they don't have is credibility," and tied his comments to the theme of credibility throughout. However, the prosecutor made several sarcastic or facetious remarks about the witnesses' moral character. For example, he referred to Eric Harris as a "great guy" and a "wonderful individual" and referred to all three of the witnesses as "angels."

Even assuming that these remarks were improper, the state appellate court found that "any minor error was not so serious as to affect the integrity of defendant's trial." *Id.* at 1008. In analyzing whether there was prejudice from improper prosecutorial questions or comments, courts look at (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the remark; (4) whether the district court provided a curative instruction; (5) whether the defendant had an opportunity to rebut the remark; and (6) the weight of the evidence against the defendant. *United States v. Nunez*, 532 F.3d 645, 655 (7th Cir. 2008). Here, the prosecutor merely commented on, and did not misstate, the witnesses' testimony, and no specific right was implicated. Petitioner had an opportunity to respond to the prosecutor's cross-examination questions in his redirect examination of his witnesses and in his own closing argument, and indeed attempted to do so. The jury was instructed that closing arguments, including the prosecutor's remarks that Eric Harris was a "great guy" and a "wonderful individual," are not evidence. And most importantly, as the Illinois Appellate Court concluded, "the evidence was not closely balanced." *People of the State of Illinois v. Brazziel*, 939 N.E.2d at 1008. In light of the six witnesses who identified Petitioner as the person that shot Larry Brown, it was not unreasonable for the appellate court to conclude that the prosecutor's brief comments regarding Petitioner's witnesses did not prejudice Petitioner

such that the outcome of his trial might have been different. See *Washington*, 417 F.3d at 787 (complaints about prosecution's allegedly improper arguments "founder[] in the face of strong evidence of * * * guilt").

## IV. Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner Brazziel a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition; instead, he must first request a certificate of appealability. See *Miller–El v. Cockrell,* 537 U.S. 322, 335 (2003); *Sandoval v. United States,* 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Miller–El,* 537 U.S. at 336; *Evans v. Circuit Court of Cook County, Ill.,* 569 F.3d 665, 667 (7th Cir. 2009). Under this standard, Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). And in cases where a district court denies a habeas claim on procedural grounds, the habeas court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. See *Slack,* 529 U.S. at 485.

Consistent with the detailed discussion above, the Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right, nor would reasonable jurists differ on the Court's assessment of Petitioner's claims. Thus, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## V. Conclusion

For the reasons stated above, the Court respectfully denies Petitioner Brazziel's petition for a writ of habeas corpus [7 and 9], declines to certify any issue for appeal, and directs the Clerk to enter judgment in favor of Respondent.

Dated: January 28, 2014

_____
Robert M. Dow, Jr.
United States District Judge